# Supreme Court of Texas

No. 23-0887

Texas Department of State Health Services and
Dr. Jennifer A. Shuford, in Her Official Capacity as
Commissioner of the Texas Department of State Health Services,

*Petitioners*,

v.

Sky Marketing Corp., d/b/a Hometown Hero; Create a Cig
Temple, LLC; Darrell Surif; and David Walden,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued January 14, 2026**

JUSTICE YOUNG delivered the opinion of the Court.

Justice Sullivan did not participate in the decision.

The legislature has charged the commissioner of the Texas Department of State Health Services with primary responsibility for overseeing the civil schedules of controlled substances. The statutory framework consciously, purposefully, and expressly authorizes her—indeed requires her—to undertake this task with a substantial and

unusual degree of discretion. That legislative choice is at least in part explained by the need for the executive branch to be capable of responding rapidly and authoritatively to emerging threats to public safety from the development of illicit and harmful substances.

One such substance is manufactured delta-8 THC. Delta-8 THC is a naturally occurring psychoactive compound found in exceedingly trace amounts in the cannabis plant (and therefore unable to produce any real or measurable psychoactive effect if consumed in its natural form). Technological developments now make it possible, however, to create artificial products containing a high concentration of manufactured delta-8 THC—more than enough to create the "high" experienced by users of marijuana (or "marihuana," as it is often spelled in government documents).

Businesses that have developed these products claim that the legislature opened the market for them in 2019. So when the commissioner attempted to clarify that, in fact, the legislature did *not* greenlight potent levels of manufactured delta-8 THC in consumable hemp products, a group of businesses and consumers asked a court to order her and the department to rewrite the schedules of controlled substances, primarily on the ground that the legislature legalized delta-8 THC in 2019, making the commissioner's actions impermissible and ultra vires.

The trial court granted this relief in the form of a temporary injunction, which the court of appeals affirmed. We now conclude that the lower courts exceeded their authority.

If the legislature desires to legalize powerful drugs, it has every tool it needs to do so—and to do so unmistakably, as we expect for such a major change to social policy. The role of the courts is merely to assess the state of

2

the law as it is. That task is complex in this case because the law governing controlled substances is itself complex, both procedurally and substantively. The textual arguments pressed by respondents and adopted by the lower courts are forceful and warrant respect. But those arguments are adequately addressed by the text, structure, and history of the Texas Controlled Substances Act, which has not divested the commissioner of discretion to include manufactured delta-8 THC as a controlled substance. Those seeking a different result must look to the other branches of government.

The judgment of the court of appeals is affirmed as to respondents' standing and otherwise reversed. We render judgment reversing the trial court's order granting the temporary injunction.

## I

### A

Both federal and state law historically have treated all parts of the cannabis plant as "marihuana," a Schedule I controlled substance. Cannabidiol (CBD) and tetrahydrocannabinols (THC) are compounds found in the cannabis plant. THC, which creates the "high" marijuana users feel, exists in the form of isomers, including delta-8 THC. Delta-8 THC is present in exceedingly trace amounts in the cannabis plant.

Congress enacted the 2018 Farm Bill, which amended the federal Controlled Substances Act to exclude "hemp" from the definition of "marihuana" and to exclude "[THC] in hemp" from Schedule I. Agriculture Improvement Act of 2018, Pub. L. No. 115–334, 132 Stat. 4490, 5018 (2018). The 2018 Farm Bill defined "hemp" as

> the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers,

3

> whether growing or not, with a delta-9 [THC] concentration
> of not more than 0.3 percent on a dry weight basis.

*Id.* at 4908.

Shortly thereafter, the legislature enacted the 2019 Texas Farm Bill, which adopted a near-identical definition of "hemp" and deleted hemp *and the THC in hemp* from the list of controlled substances under the Texas Controlled Substances Act. Act of May 26, 2019, 86th Leg., R.S., ch. 764, §§ 2, 8, 2019 Tex. Gen. Laws 2085, 2086, 2100–01. The term "marihuana" now "does not include . . . hemp," Tex. Health & Safety Code § 481.002(26)(F), and the term "controlled substance" now "does not include hemp, . . . *or the* [*THC*] *in hemp*," *id.* § 481.002(5) (emphasis added). Under Texas law, "hemp" means

> the plant Cannabis sativa L. and any part of that plant,
> including the seeds of the plant and all derivatives, extracts,
> cannabinoids, isomers, acids, salts, and salts of isomers,
> whether growing or not, with a delta-9 [THC] concentration
> of not more than 0.3 percent on a dry weight basis.

Tex. Agric. Code § 121.001. The Texas Farm Bill did not itself amend the THC or "marihuana extract" definitions in the list of Schedule I controlled substances, but the commissioner subsequently amended the THC and "marihuana" definitions to conform the 2019 and 2020 Schedules to the 2019 Texas Farm Bill. *See* 44 Tex. Reg. 2514, 2516–17 (2019); 45 Tex. Reg. 2249, 2251 (2020).

In August 2020, the federal Drug Enforcement Administration issued an interim final rule that "amend[ed] the scope of substances falling within" the federal definition of Schedule I "marihuana extract" and clarified that "hemp-derived extracts containing less than 0.3%-THC content are also decontrolled along with the [hemp] plant itself." Implementation of

4

the Agriculture Improvement Act of 2018, 85 Fed. Reg. 51639, 51641–42, 51644 (Aug. 21, 2020) (codified at 21 C.F.R. pts. 1308, 1312).

Back in Texas, the commissioner objected to those DEA modifications "to the extent that the definitions allow for the presence or addition of [THC] aside from the presence of delta-9-[THC]." 45 Tex. Reg. 6613, 6614 (2020). Her objection was specifically authorized by Health & Safety Code § 481.034(g), under which federal actions are automatically incorporated into Texas law *unless* the commissioner timely objects. Her notice of objection was posted to the department's website in September 2020, and she held a public hearing the next month, but the department received no comments at the hearing or in writing.

Accordingly, in January 2021, the commissioner issued a final decision declining to adopt the DEA's modifications. *See* 46 Tex. Reg. 873, 873–74 (2021). She then updated Schedule I's THC and "marihuana extract" definitions to comport with the objection and to clarify Texas law in light of the change in federal law that had occasioned her objection:

> *(31) Tetrahydrocannabinols, meaning [THC] naturally contained in a plant of the genus Cannabis (cannabis plant), except for **up to 0.3 percent delta-9-**[THC] in hemp (as defined under Texas Agriculture Code 121~~Section 297A(1) of the Agricultural Marketing Act of 1946~~), as well as synthetic equivalents of the substances contained in the cannabis plant, or in the resinous extractives of such plant, and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant, . . . ;
>
> . . .
>
> *(58) Marihuana extract, meaning an extract containing one or more cannabinoids that has been derived from any plant of the genus Cannabis, **except for extracts**

5

**derived from hemp (as defined under Texas Agriculture Code 121) containing up to 0.3% delta-9-[THC] on a dry weight basis,** other than ~~the~~ separated resin (whether crude or purified) obtained from the plant[.]

*Compare* 46 Tex. Reg. 1763, 1768, 1770 (2021), *with* 45 Tex. Reg. at 2251–52 (amendments bolded and struck through). In October 2021, the department announced on its website that

Texas Health and Safety Code Chapter 443 (HSC 443), established by House Bill 1325 (86th Legislature), allows Consumable Hemp Products in Texas that do not exceed 0.3% Delta-9 [THC]. *All other forms of THC, including Delta-8 in any concentration and Delta-9 exceeding 0.3%, are considered Schedule I controlled substances.*

(Emphasis added.)

## B

The plaintiffs below, who are respondents in this Court, are a group of licensed manufacturers, registered retailers, and individual consumers—collectively, the "vendors." The vendors sued the department and the commissioner, seeking temporary and permanent injunctions and declaratory relief. They allege that the 2018 Farm Bill and 2019 Texas Farm Bill opened a market for consumable hemp products containing manufactured delta-8 THC, which is converted from hemp-derived CBD through a variety of processes. These products contain higher delta-8-THC concentrations than could ever naturally occur in the hemp plant. The vendors entered this burgeoning delta-8-THC market, and the department issued licenses to some of the vendors and similarly situated businesses.

Businesses and consumers thus operated under the assumption that only products with a delta-9-THC concentration over 0.3% were illegal. But when the commissioner published the 2021 Schedules and

6

purported to control manufactured delta-8-THC products, hemp businesses scrambled to "pull products from the shelves, abruptly halt sales, [and] destroy significant amounts of inventory."

The vendors asserted ultra vires claims against the commissioner, alleging that she lacked discretion to modify the 2021 Schedules pursuant to Health & Safety Code § 481.034(g) and was instead required to, but did not, comply with other procedures enumerated in §§ 481.034–.035. The vendors also brought a claim against the department under the Texas Administrative Procedure Act, asserting that the 2021 amendments and the October 2021 statement on the department's website were invalid "rules." The vendors further alleged that the department's website statement and the commissioner's modifications to the THC and "marihuana extract" definitions purported to control hemp products that the 2019 Texas Farm Bill expressly legalized. The vendors therefore sought, among other relief, a temporary injunction "enjoin[ing] the effectiveness going forward of the amendments to the definitions for the terms '[THC]' and '[m]arihuana extract'" in the 2021 Schedules.

The department and commissioner responded with a plea to the jurisdiction, asserting sovereign immunity and challenging the vendors' standing. The commissioner and department first argued that the vendors lack standing because the department possesses only civil-enforcement authority and cannot criminally enforce the Texas Controlled Substances Act. And because the vendors' alleged injury arises from threat of criminal enforcement, that injury is not redressable by an injunction against the commissioner and department.

The commissioner further asserted that the vendors failed to allege a viable ultra vires claim because she acted within her § 481.034(g) authority to reject federal modifications to the THC and "marihuana extract" definitions. THC, including delta-8 THC, has been a Schedule I controlled substance for over forty years, and the 2019 Texas Farm Bill created a limited exception for up to 0.3% concentration of delta-9 THC naturally contained in the cannabis plant. Delta-8 THC occurs in almost undetectably trace amounts in hemp, but it can be derived synthetically from CBD to produce a dramatically higher concentration than that which occurs naturally in the cannabis plant. Texas law considers such synthetic THC to be a Schedule I controlled substance. *See* 46 Tex. Reg. at 1768 (listing "synthetic equivalents of the substances contained in the cannabis plant, . . . and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant" as Schedule I controlled substances).

After a hearing, the trial court denied the plea to the jurisdiction and granted a temporary injunction preserving what it termed "the status quo that existed prior to" the allegedly ultra vires conduct and APA violation. The court purported to enjoin "the effectiveness going forward of amendments to the terms '[THC]' and '[m]arihuana extract' in" the 2021 Schedules and ordered the department to "remove from its currently published Schedule of Controlled Substances the most recent modifications of the definitions," as well as "any subsequent publications of the same (if any)." The court also purported to enjoin the "effectiveness going forward of the rule stated on [the department]'s website that Delta-8 THC in any concentration is considered a Schedule I controlled substance."

8

The department appealed, *see* Tex. Civ. Prac. & Rem. Code § 51.014(a)(4), (8); Tex. R. App. P. 28.1(a), and the court of appeals affirmed, 711 S.W.3d 227 (Tex. App.—Austin 2023). The court held that the vendors have standing; the trial court did not err in denying the plea to the jurisdiction as to the vendors' ultra vires and APA claims; and the trial court did not abuse its discretion in granting a temporary injunction. We granted the department's ensuing petition for review.

## II

As always, our first obligation is to confirm the subject-matter jurisdiction of this Court and the lower courts. Two justiciability doctrines are central to that inquiry here: standing and ripeness.

Standing is about *who* can sue. It concerns the nature and sufficiency of the plaintiff's connection with the litigation's subject matter, so that courts are not tempted to resolve legal issues at the request of someone lacking the requisite interest in the outcome. That is why at least one named plaintiff must have a "personal stake" in a case and "be able to answer a basic question: 'What's it to you?'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 (2026) (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)); *see also Heckman v. Williamson County*, 369 S.W.3d 137, 152 (Tex. 2012). To answer this question, a plaintiff "must show (1) an 'injury in fact' that is (2) 'fairly traceable' to the defendant's challenged action and (3) redressable by a favorable decision." *Abbott v. Mex. Am. Legis. Caucus*, 647 S.W.3d 681, 690 (Tex. 2022).

Ripeness, on the other hand, is about *when* a plaintiff—even one with a sufficient personal stake—may bring suit. It probes whether the

9

dispute is one that is ready for judicial review. *Waco ISD v. Gibson*, 22 S.W.3d 849, 851–52 (Tex. 2000). The touchstone of ripeness is "whether, *at the time a lawsuit is filed*, the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Id.* (quoting *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998)). And if a plaintiff's claimed injury-in-fact "is based on 'hypothetical facts, or upon events that have not yet come to pass,' then the case is not ripe[.]" *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020) (quoting *Gibson*, 22 S.W.3d at 852). Plaintiffs, therefore, may not invoke the judicial process merely because they contend that a law or other governmental action is unconstitutional or otherwise illegal, or even because they anticipate eventual harmful effects from such governmental conduct. Reaching the merits of an unripe controversy constitutes issuing an advisory opinion, which is not within the authority that the Texas Constitution confers on the courts. *See Tex. Dep't of Fam. & Protective Servs. v. Grassroots Leadership, Inc.*, 717 S.W.3d 854, 872 (Tex. 2025). As with all the justiciability doctrines, ripeness helps ensure that the judiciary's work always constitutes enforceable resolutions of genuine and live disputes. *See id.* at 866–67.

Ripeness and standing are distinct but have considerable overlap. Both doctrines "emphasize[] the need for a concrete injury for a justiciable claim to be presented." *Lynch*, 595 S.W.3d at 683 (quoting *Patterson*, 971 S.W.2d at 442). All justiciability doctrines "work together to ensure that at every stage of litigation, a live dispute exists that is proper for judicial resolution[.]" *Grassroots Leadership*, 717 S.W.3d at 867. A case failing one of the tests "often will fail" another. *Id.* Or, as here, a case passing one of

the tests often will pass the other.

Our standing inquiry begins with the alleged injury-in-fact, which "must be concrete and particularized, actual or imminent, not hypothetical." *Heckman*, 369 S.W.3d at 155 (quoting *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008)). We assess whether a plaintiff has "plead[ed] facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury." *Id.*

The vendors have met that burden. According to their second amended petition, Sky Marketing Corporation, doing business as Hometown Hero, is a Texas business that openly sold delta-8-THC products in the wake of the 2019 Texas Farm Bill. The business applied for a Texas Hemp License in September 2020, which the department issued in September 2021. When the commissioner issued the 2021 Schedules, Sky Marketing scrambled to pull its products, halt sales, and destroy inventory. The alleged result was that Sky Marketing missed out on revenue previously earned through the sale and distribution of delta-8-THC products, fired significant portions of its workforce, suffered harm to its business reputation, and was deprived of a property interest in its department-issued Texas Hemp License.

Sky Marketing's cognizable injury is therefore straightforward. It allegedly suffered lost sales and revenue resulting in economic and reputational harm. The "loss of even a small amount of money is ordinarily an 'injury'" for standing purposes. *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 251 (Tex. 2023) (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017)); *accord, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (concluding that a company's

11

"allegations of lost sales and damage to its business reputation give it standing under Article III"); *Bost*, 607 U.S. at 78 ("[R]eputational harms, as a general matter, are classic Article III injuries." (alteration in original) (quotation marks omitted)); *see also, e.g.*, *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113–14 (2025) (holding that fuel producers' "decrease in purchases of gasoline and other liquid fuels resulting from the California regulations hurt[] their bottom line" and such "monetary costs" were "of course an injury" (quotation marks omitted)).

The second prong of our standing inquiry requires that Sky Marketing's alleged injury be fairly traceable to the department's conduct rather than the result of an "independent action of some third party not before the court." *Heckman*, 369 S.W.3d at 154 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). The vendors must show that there is "a causal connection between the injury and the conduct complained of." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Here too, Sky Marketing has an obvious answer: as a department-licensed business in a highly regulated industry, it must refrain from engaging in illegal conduct or else face civil penalties or revocation of its license and registration. When the commissioner modified the schedules and announced that delta-8-THC products were banned, Sky Marketing was required to stop manufacturing and selling such products. Failure to comply with the department's regulatory standards meant Sky Marketing stood to lose its license, which was "valid for one year and may be renewed annually, provided [it] remains in good standing." 25 Tex. Admin. Code § 300.502(c) (2020) (amended 2026). And losing its license meant Sky

Marketing's operations would cease. Indeed, the "whole point" of the amendments was to put an end to the very economic activity in which Sky Marketing was engaged. *Diamond Alt.*, 606 U.S. at 114 (reasoning that the challenged regulations "likely cause[d]" the plaintiffs' injuries because the regulations targeted the plaintiffs' market).

To be clear, we are not asked to hold that allegations of vague consequences that may or may not follow from a general failure to obey the law can confer standing. Were that enough, standing (and ripeness) would be a nullity. This case's context illustrates the kind of individualized circumstances that distinguish between mere disagreement with a law or governmental action (no standing) and actual or imminent injury caused by such an action (standing). Sky Marketing is part of a highly regulated industry for which a license is affirmatively required to operate, and maintaining a valid license is expressly conditioned on strict compliance with the department's rules and regulations. As these rules and regulations change, market participants are bound to adapt expediently. These conditions transform Sky Marketing's *choice* to comply into compliance based on the government's coercive power. Like the difference between money voluntarily paid on a claim of right based upon one's independent understanding of his liability under the law and a mandatory payment made in response to a judgment of a court (even before the prevailing party has executed that judgment on him), *see Miga v. Jensen*, 299 S.W.3d 98, 103–04 (Tex. 2009), licensed participants in this uniquely regulated market do not comply with the regulations voluntarily but mandatorily, under the shadow of the department's full enforcement authority.

13

Under the circumstances of this case, therefore, Sky Marketing was not obligated to bet the farm by violating Texas law and risking severe—potentially fatal—penalties to obtain judicial review. Indeed, its fears were rationally occasioned: a similarly situated business received a letter from law enforcement threatening not merely civil but criminal penalties because manufactured delta-8 THC is a controlled substance. Because compliance caused Sky Marketing to suffer economic and reputational harm, and its compliance could in no way be described as voluntary, its injury is traceable to the department's actions.

The final standing element requires that Sky Marketing's alleged injury be redressable—*i.e.*, "likely to be redressed by the requested relief[.]" *Heckman*, 369 S.W.3d at 155. "When a plaintiff is the 'object' of a government regulation, there should 'ordinarily' be 'little question' that the regulation causes injury to the plaintiff and that invalidating the regulation would redress the plaintiff's injuries." *Diamond Alt.*, 606 U.S. at 114 (quoting *Lujan*, 504 U.S. at 561).

That principle applies here. Invalidating the department's actions purporting to ban delta-8-THC products would redress at least some of Sky Marketing's monetary and reputational injury by allowing it to return to manufacturing and selling those products. Our confidence in this conclusion is reinforced by the fact that manufactured delta-8-THC products have sprung back, and the hemp industry has operated and openly sold them without fear of department penalty, during the pendency of the trial court's temporary injunction.

Yet the department asserts that because it cannot *criminally* enforce the schedules, an injunction would ring hollow. The department is

correct that an "injunction is an empty vessel if the enjoined official never had the power to enforce the law in the first place." *State v. Zurawski*, 690 S.W.3d 644, 659 (Tex. 2024). But criminal enforcement is not the only way the law can have teeth. The department's civil-enforcement authority is sharp enough. *See* Tex. Health & Safety Code § 431.207(a)(7) (empowering the department to revoke or refuse to issue a license if an applicant or licensee violates the Texas Controlled Substances Act, which includes the schedules); *id.* § 431.021(x) (prohibiting the distribution or manufacturing of drugs without a department-issued license); *id.* § 431.058 ("The attorney general at the request of the department may bring a civil action to recover an administrative penalty."). The department has not disclaimed any intention to civilly enforce the schedules against Sky Marketing should the temporary injunction be lifted. *See In re Abbott*, 601 S.W.3d 802, 812 (Tex. 2020) (concluding that plaintiffs had no standing in part because "the State in its briefing disclaim[ed] any intention by the Governor or the Attorney General to affirmatively enforce" the challenged law).

The injunction, therefore, would redress Sky Marketing's alleged injury. *See Zurawski*, 690 S.W.3d at 660 (concluding that plaintiff's Human Life Protection Act civil-enforcement claim was redressable by a favorable injunction against the attorney general because the attorney general could recover civil penalties for violations of the act).

For similar reasons, we are also satisfied that this lawsuit is ripe for judicial review. The coercive nature of this regulatory regime "as a practical matter require[d]" Sky Marketing "to adjust [its] conduct immediately," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), and its swift compliance allegedly cost Sky Marketing at least 50% of its revenue

stream. Given the coercive nature of the licensing regime that directly and extensively regulated Sky Marketing's business, its fears about department enforcement were concrete, not based on a speculative hunch about what *might* occur at some unascertainable time in a future, hypothetical enforcement scenario. The pocketbook injury, which it alleges followed directly from compliance, is also sufficiently concrete. *See, e.g.*, *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) (concluding that there was "no question" the pre-enforcement challenge was justiciable where the challenged regulation was "directed at [the plaintiffs] in particular;" the regulation "require[d] them to make significant changes in their everyday business practices;" and "if they fail[ed] to observe the [regulation, the plaintiffs were] quite clearly exposed to the imposition of strong sanctions"); *cf. Abbott*, 601 S.W.3d at 812 ("A plaintiff does not need to be arrested and prosecuted before suing to challenge the constitutionality of a criminal law.").

\* \* \*

The vendors allege that at least one named plaintiff, Sky Marketing, suffered lost sales and revenue resulting in economic and reputational harm. This alleged injury can be traced directly to the modified schedules, over which the department exercises civil enforcement authority, and is redressable by an injunction prohibiting the department from enforcing certain amendments to the 2021 Schedules. We therefore conclude that the vendors have standing and the claims are ripe for judicial review.

## III

The vendors' ultra vires claims can be distilled into two issues. The first is procedural: they allege that the commissioner exceeded her

16

discretion by modifying the 2021 Schedules in violation of Health & Safety Code § 481.034, which establishes the procedural avenues through which the commissioner may modify the schedules. The second is substantive: the vendors allege that the commissioner acted beyond her statutory authority by modifying the 2021 Schedules in a manner contrary to the 2019 Texas Farm Bill.

We conclude that the vendors do not allege a valid ultra vires claim, so sovereign immunity applies. The commissioner lawfully modified the Schedule I terms THC and "marihuana extract" pursuant to § 481.034(g), and the amendments do not conflict with the 2019 Texas Farm Bill.

**A**

The commissioner's broad authority to amend the schedules flows from the Texas Controlled Substances Act, which directs her to "establish and modify the . . . schedules of controlled substances" in Schedules I–V, Tex. Health & Safety Code § 481.032(a), subject to certain procedural safeguards enumerated in § 481.034. The commissioner may modify the schedules through two procedural avenues outlined in § 481.034.

First, under subsection (g), "if a substance is designated, rescheduled, or deleted as a controlled substance under federal law and notice of that fact is given to the commissioner," the commissioner "similarly shall designate, reschedule, or delete the substance, unless the commissioner objects during the period." *Id.* § 481.034(g). If the commissioner objects, she "shall publish the reasons for the objection," "give all interested parties an opportunity to be heard," and "publish a decision, which is final unless altered by statute." *Id.*

Second, when the commissioner is not responding to a federal

17

change but has a separate reason for modifying the schedules—such as responding to new developments in the real world—she must comply with other procedural obligations. She must, for example, "hold[] a public hearing on the matter in Austin and obtain[] approval from the executive commissioner," *id.* § 481.034(b); consider eight factors in making her determination, *id.* § 481.034(d); make findings with respect to those factors, *id.* § 481.034(e); and give written notice to the director and the relevant state licensing agencies when she designates, deletes, or reschedules a substance, *id.* § 481.034(h). She must also modify the schedules consistent with § 481.035, *id.* § 481.034(a)(1), and with the executive commissioner's approval, *id.* § 481.034(a)(3).

The law also imposes substantive limitations on the commissioner's authority, but those limitations are strikingly narrow. For example, she may not modify the schedules to "(1) add a substance to the schedules if the substance has been deleted from the schedules by the legislature; (2) delete a substance from the schedules if the substance has been added to the schedules by the legislature; or (3) reschedule a substance if the substance has been placed in a schedule by the legislature." *Id.* § 481.034(c). Those express limitations are notable because, in truth, they go without saying. If a *statute* authorizes a particular substance, then it is hardly necessary to say that an administrative agency may not contradict it. Likewise, if a *statute* prohibits a substance, who could seriously argue that an agency could authorize it? The limitations of § 481.034(c) are meaningful, therefore, primarily by signaling that *only* such a direct repudiation of the commissioner's decisions *by the legislature* can authorize the judiciary to set her decisions aside. Section 481.034(c), in other words,

18

confirms that the legislature expected the commissioner to have an unusually high degree of discretion to modify the schedules and respond to new developments, which is especially important today, given the technological capacity to develop new chemicals quickly.

Indeed, the Texas Controlled Substances Act's statutory history confirms that the legislature has provided basic principles as guidance but charges the department with primary responsibility for determining which specific substances should be controlled and to what schedule they should be assigned. The legislature rarely adds or deletes controlled substances in Schedules I–V. The Court is aware of only two instances in the past twenty or so years that the legislature has directly scheduled a substance: the 2019 Texas Farm Bill and a 2009 amendment adding carisoprodol to Schedule IV. *See* Act of June 1, 2009, 81st Leg., R.S., ch. 774, § 4, 2009 Tex. Gen. Laws 1961, 1963. By contrast, the legislature has actively amended the list of controlled substances in the criminal Penalty Groups, which the department does not control. *See, e.g.*, Act of May 24, 2023, 88th Leg., R.S., ch. 910, §§ 2–3, 2023 Tex. Gen. Laws 2898, 2898–2902 (rescheduling substances from Penalty Group 1 to Penalty Group 1–B); Act of June 1, 2021, 87th Leg., R.S., ch. 584, §§ 2–3, 2021 Tex. Gen. Laws 1174, 1177–78 (creating Penalty Group 1–B and rescheduling various types of fentanyl from Penalty Group 1 to Penalty Group 1–B); Act of May 27, 2017, 85th Leg., R.S., ch. 491, §§ 1–2, 2017 Tex. Gen. Laws 1301, 1301–09 (adding six substances to Penalty Group 1 and three substances to Penalty Group 3).

Beyond possessing broad discretion and primary regulatory authority over Schedules I–V, the commissioner's objections to federal changes are final—that is, a federal change becomes part of Texas law

automatically unless the commissioner objects, and if she does, the eventual decision is subject only to legislative revision. It is "final *unless altered by statute*." Tex. Health & Safety Code § 481.034(g) (emphasis added). Again, a statute will always trump agency action. Adding "unless altered by statute" makes clear that no other basis for a challenge will be cognizable, so § 481.034(g) is tantamount to announcing that, should the commissioner's objection be problematic, the legislature will itself provide any correction.

With this statutory framework in mind, we turn to the vendors' ultra vires claims.

**B**

The vendors contend that the commissioner lacked discretion to modify the 2021 Schedules pursuant to § 481.034(g) because the DEA's interim final rule was not a scheduling event; the commissioner's objection was improper; the commissioner's objection did not authorize her to modify the schedules; and even if the amendments were procedurally authorized, they substantively conflict with the 2019 Texas Farm Bill. We disagree with each contention.

A plaintiff bringing an ultra vires claim must "establish that the [official] acted beyond [his] lawful authority" to survive a plea to the jurisdiction. *Chambers-Liberty Counties Navigation Dist. v. State*, 575 S.W.3d 339, 349 (Tex. 2019). We then "determine whether, based on the limited record in th[e] interlocutory appeal, we agree with the [plaintiff] that the [official's action] conflicts with state law." *Id.*

We have also explained that "the effect of a statute making an executive determination final is to broaden the executive's discretion by

20

disallowing challenges to executive decisions," thereby rendering a challenge nonjusticiable when it "involve[s] executives acting of their own volition in making determinations." *Willacy County Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 51 (Tex. 2018). So too here. The commissioner's § 481.034(g) objections are "final" and therefore binding "unless altered by statute." Tex. Health & Safety Code § 481.034(g). The finality provision inherently reposes substantial discretion in the commissioner.

The vendors present significant and forceful arguments that the 2019 Texas Farm Bill protects their chosen conduct, but they have not established an insoluble conflict between the commissioner's listing decision and the express terms of § 481.034(g) or the 2019 Texas Farm Bill. We accordingly hold that sovereign immunity applies because, as to both their procedural and substantive challenges, the vendors' ultra vires claims fail.

Start with procedure. The commissioner acted within her discretion in determining that the federal rule effected a substantive alteration to a controlled substance under federal law, thereby triggering subsection (g). By its terms, the federal interim final rule "*amend*[*ed*] the scope of substances falling within" the definition of federal Schedule I "marihuana extract," 85 Fed. Reg. 51641 (emphasis added), and "*decontrolled*" "hemp-derived extracts containing less than 0.3%-THC content . . . along with the plant itself," *id.* at 51644 (emphasis added).

It was expressly within the commissioner's unreviewable, discretionary authority to object rather than allow the federal changes to automatically become part of Texas law. We have no jurisdiction to

opine on the merits of the objection; as discussed, the legislature reserved to itself the *exclusive* authority to review a commissioner's objection pursuant to § 481.034(g). *See Willacy County*, 555 S.W.3d at 51. We do not understand the vendors to seriously challenge this legal position.

We further conclude that § 481.034(g) authorized the commissioner to update Schedule I's THC and "marihuana extract" definitions to comport with her objection that the modified federal "definitions allow for the presence or addition of [THC] aside from the presence of delta-9-[THC]," 45 Tex. Reg. at 6614, and to clarify Texas law in light of the change in federal law that had prompted her objection. Because the modifications were made in response to federal law, the other procedures enumerated in §§ 481.034–.035 that bind the commissioner's unilateral modifications did not apply.

The commissioner therefore complied with all the procedural requirements that governed her actions. She published the reasons for the objection on the department's website. *See id.* at 6613–14. And she gave all interested parties an opportunity to be heard at the October 2020 public hearing (at which the department received no comments). *See* 46 Tex. Reg. at 874. Following the hearing, she published a final decision declining to adopt the DEA's modifications, *see id.* at 873–74, and later clarified Texas law in light of that objection, *see id.* at 1768, 1770. There can be no real doubt that, in light of the broad discretion reposed in the commissioner, she possesses the authority to provide such clarifications about the legal regime that she is charged with superintending. We hold that the commissioner complied with the procedural requirements enumerated in § 481.034(g), which means that the vendors' procedural

22

ultra vires claim fails and sovereign immunity applies.

Next, the substantive ultra vires claim. The vendors contend that the 2019 Texas Farm Bill decontrolled all non-delta-9 THC, including delta-8 THC at any concentration. They assert that only products with a delta-9-THC concentration over 0.3% are illegal, so the commissioner's 2021 modifications contravened the 2019 Texas Farm Bill.

That view is plausible and indeed rooted in the statutory text. The 2019 Texas Farm Bill removed "hemp" and "the [THC] in hemp" from Schedule I. Tex. Health & Safety Code § 481.002(26)(F). And hemp is any part of the cannabis plant "with a delta-9 [THC] concentration of *not more than 0.3 percent* on a dry weight basis." Tex. Agric. Code § 121.001 (emphasis added). The legislature thus imposed a 0.3% delta-9-THC content limit—all parts of the cannabis plant with a delta-9-THC concentration of greater than 0.3% are marijuana (a Schedule I controlled substance), and all parts of the plant with a delta-9-THC concentration less than or equal to 0.3% are hemp (and therefore decontrolled). Since manufactured delta-8-THC products are converted from CBD, a substance *below* that 0.3% delta-9-THC limit, the 2019 Texas Farm Bill *could* be read to authorize manufactured delta-8-THC products.

But our understanding of and respect for this textual argument does not entail an ultra vires finding because the argument does not reflect the most natural interpretation given the Texas Controlled Substances Act's text, structure, and statutory history. We have long recognized the "fundamental principle of statutory construction that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *Willacy County*, 555 S.W.3d at 39. We therefore

23

"avoid construing a statutory provision in isolation from the rest of the statute" and instead "consider the act as a whole, and not just single phrases, clauses, or sentences." *Cities of Austin, Dallas, Fort Worth & Hereford v. Sw. Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002).

The legislature went to considerable effort to create a reticulated legal structure where the commissioner is the primary decisionmaker in establishing and modifying the schedules. It empowered the commissioner with broad discretion—subject only to the obvious limitation that her actions cannot contravene what the legislature itself has decreed by statute. *See* Tex. Health & Safety Code § 481.034(c). And if she oversteps (or understeps), the legislature has made itself the primary entity for correction. The legislature has rarely disturbed the commissioner's decisions, which further justifies regarding the commissioner as exercising primary regulatory authority; but in those rare instances when the legislature *has* spoken in this area, it has done so clearly and unambiguously. *See, e.g.*, *id.* § 481.037 ("Schedule IV includes carisoprodol."); *id.* § 481.002(26)(F) ("'Marihuana' . . . does not include hemp"); *id.* § 481.002(5) ("'Controlled substance' . . . does not include hemp, . . . or the [THC] in hemp."). We would expect such a clear and unambiguous response in this instance, too, if the commissioner indeed had exceeded her mandate.

When the legislature adds, deletes, or reschedules substances, therefore, it speaks with clarity if it means to upend a historic regulatory principle. That practice comports with the familiar maxim that legislatures don't "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Absent a clear statement, we decline to imply

significant disruptions to the commissioner's longstanding regulatory authority. Said differently, if the legislature wishes to eliminate the commissioner's discretion in this highly discretion-laden area, it will do so clearly.

These principles require us to reject the vendors' assertion that the legislature put the elephant of all THC (even THC created wholly artificially) in the mousehole that governs only the natural plant itself. The legislature amended the definition of "marihuana" by exempting and defining "hemp," which covers only the *naturally occurring* constituents of THC in hemp. *See* Tex. Agric. Code § 121.001. Because the legislature's "hemp" exception does not unambiguously include the naturally occurring hemp plant *and* a final consumable product containing levels of THC that substantially exceed those naturally existing in any actual hemp plant, we must reject the contention that the 2019 Texas Farm Bill itself decontrolled anything more than the exceedingly trace amounts of delta-8 THC that naturally occur in hemp. Holding otherwise would require us to accept the doubtful premise that the legislature decontrols potent substances (here, THC and marijuana extract) casually or by implication.

Embracing the vendors' argument would also require us to conclude that consumable hemp products containing potent levels of delta-8 THC cannot be illegal synthetic analogues (as the department treats them). It would require us to understand the term "all derivatives" in the definition of "hemp" to encompass not only the plant itself and its naturally occurring compounds, but also *any* compound at *any* potency that theoretically *could* be derived from the hemp plant by someone in a lab—even if such a compound never appears or could appear in nature and even if the final

25

product emulates the THC in marijuana. Again, if the legislature intended such a massive change to such a significant area of social policy, we would expect it to speak clearly. Otherwise, we cannot conclude that it intended so indirectly to remove the commissioner's discretion to designate manufactured products with potent THC levels as synthetic equivalents to marijuana.

There is one potential conflict between the amended schedules and the 2019 Texas Farm Bill, but it is one that the government has disclaimed any intention to enforce—in part because it cannot. The 2019 Texas Farm Bill excluded "[THC] in hemp" from the definition of "controlled substance," Tex. Health & Safety Code § 481.002(5), and it is undisputed that delta-8 THC is naturally present in trace amounts in the hemp plant—so trace, in fact, that it apparently is almost impossible even to test for it. These naturally occurring delta-8-THC isomers were decontrolled by statute. There is therefore at least some theoretical tension between the 2019 Texas Farm Bill and the 2021 Schedules, which narrowed the THC-in-hemp exemption by controlling all but *one* naturally occurring THC isomer in hemp—delta-9 up to 0.3% dry weight. *See* 46 Tex. Reg. at 1768 (exempting "up to 0.3 percent *delta-9-*[*THC*] *in hemp*" from the term THC in Schedule I (emphasis added)).

The commissioner, however, has represented to the Court that delta-8 THC that naturally occurs in the hemp plant is tolerable under the current legal regime. In light of reality, in which such amounts are not even detectable, how could she do otherwise? For that same reason, however, this concession is of no benefit to the vendors. The manufactured delta-8-THC products the vendors wish to manufacture and sell

26

substantially—dramatically—exceed the delta-8-THC content that naturally exists in any actual hemp plant. An injunction against the commissioner, who has disclaimed any intention to enforce the only conflict between the 2021 Schedules and the 2019 Texas Farm Bill, would therefore be an "empty vessel" courts lack subject-matter jurisdiction to issue. *Zurawski*, 690 S.W.3d at 659.

\* \* \*

The legislature clearly defined "hemp" to encompass the plant itself and the compounds as found in the plant. The legislature gave that inch, but the vendors claim a mile—that the legislature exempted *all* THC, even in non-naturally-occurring ways. We reject that contention, which would unsettle the structure of this highly regulated area of law and inject the judiciary into matters wholly occupied by the other branches. Until there is a clear withdrawal of the commissioner's discretion, no court can properly deem the commissioner's listing decisions to have been made ultra vires.

**IV**

We turn now to the APA claim against the department. This claim arises out of the department's October 2021 website announcement that "[a]ll other forms of THC, *including Delta-8 in any concentration* and Delta-9 exceeding 0.3%, are considered Schedule I controlled substances." (Emphasis added.) The vendors allege that this website statement constitutes an APA "rule" that was published without the required public notice, opportunity for comment, or reasoned justification. And because the APA waives sovereign immunity for a claim challenging the validity or applicability of an agency's rule "if it is alleged that the rule or its threatened application interferes with or impairs . . . a legal right or

27

privilege of the plaintiff," Tex. Gov't Code § 2001.038(a), they argue the APA claim survives the department's plea to the jurisdiction.

It is not the APA, however, but the Texas Controlled Substances Act that governs the department's publication of modifications to the Texas schedules. Where a "well-established regulatory scheme and the legislation governing it" provide the procedures agencies must follow in taking specific actions, APA procedures do not apply. *PUC v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024). Section 481.034 and the broader Texas Controlled Substances Act provide a "well-established regulatory scheme" for establishing, modifying, and publishing the schedules, so the APA is the wrong statutory framework to invoke.

It would make little sense for modification and publication of the schedules themselves to be subject to § 481.034 procedures but a mere website-published policy statement purporting to summarize or describe such modifications and publications be subject to separate APA procedures. Otherwise, almost any governmental statements about the government's understanding of current policy or law in any context imaginable could be converted into APA "rulemaking" subject to judicial scrutiny. *Cf. TEA v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994) ("Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review."). Would a speech by an executive-branch official—perhaps the governor himself—describing a view of current law constitute APA "rulemaking"? Why not, if a website's comment about public policy would?

We hold instead that an agency pronouncement purporting to merely summarize rules promulgated via a non-APA process is not itself

28

an APA rule. The statement did not purport to amend the schedules. Even if it had, however, it would have been subject not to APA procedures but to § 481.034. Moreover, the department acknowledges that the announcement has no independent legal effect. No one can be civilly penalized for violating the statement. *Cf. El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008) (indicating that APA rules carry the "effect of law"). Unsurprisingly, the department has disclaimed any intention to enforce the website statement. An injunction purporting to invalidate such a statement's effectiveness would be meaningless, not to mention an unacceptable intrusion by the judiciary into the work of a co-equal branch of government. Sovereign immunity bars the vendors' APA claims.

## V

Because sovereign immunity bars the vendors' claims, the temporary injunction must be reversed. Two features of the trial court's injunction, however, warrant mention.

First, the trial court ordered the department to "remove from its currently published Schedule of Controlled Substances the . . . modifications of the definitions to the" terms THC and "marihuana extract," as well as "any subsequent publications of the same (if any)." The temporary injunction, in other words, goes beyond vindicating what the trial court mistakenly understood to be the rights of parties before it, and actually purports to instruct policymakers in the executive branch to rewrite the schedules themselves. Such an order aggrandizes judicial power and transgresses the separation of powers. *Cf. Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) ("[U]nder traditional equitable

29

principles, no court may 'enjoin the world at large,' or purport to enjoin challenged 'laws themselves.'" (citations omitted)); Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018) (arguing that federal courts lack "authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute").

Second, the trial court's temporary injunction prohibits enforcement of the amendments against anyone in the State, not just the plaintiffs to this lawsuit. The U.S. Supreme Court has instructed federal courts that such "universal injunctions" "likely exceed the equitable authority that Congress has granted to" those courts. *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). We have held that orders issued pursuant to Texas Rule of Appellate Procedure 29.3 cannot grant relief to "any and all nonparties who may find themselves in circumstances similar to the plaintiffs'" in a suit. *In re Abbott*, 645 S.W.3d 276, 283 (Tex. 2022) (quotation marks omitted). We need not resolve whether the scope and nature of the trial court's temporary injunction here was improper because we reverse it on other grounds, but we caution Texas courts to ensure that any injunction they issue is no broader than necessary to protect the rights of the parties before them.

\* \* \*

We affirm the judgment of the court of appeals as to standing and reverse as to the ultra vires and APA claims. We render judgment reversing the trial court's order that granted the temporary injunction.

_____
Evan A. Young
Justice

**OPINION DELIVERED:** May 1, 2026